

**U.S. Department of Justice**

*United States Attorney
Southern District of New York*

---

*The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278*

April 18, 2025

**BY ECF**
Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Mohanad Al-Zubaidi*, **24 Cr. 51 (PKC)**

Dear Judge Castel:

      The Government respectfully submits this letter in advance of the April 22, 2025 sentencing of defendant Mohanad Al-Zubaidi. For the reasons explained below, the Government respectfully submits that a sentence of 57 months' imprisonment, which is at the bottom of the applicable Guidelines range, would be sufficient but not greater than necessary to serve the purposes of sentencing.

## I. Background

### A. Offense Conduct

#### 1. Overview of the Defendant's Scheme

      As set forth in the Presentence Investigation Report ("PSR") and in the Indictment (Dkt. 1), between 2018 and at least 2022, the defendant, his father—Abdulkader Hamza—and another co-conspirator—Shaker Hauter—operated an unlicensed money transfer business that was responsible for illicitly moving more than $65 million between the United States and countries in the Middle East and elsewhere, including Yemen, Turkey, Iraq, the United Arab Emirates, and Jordan, on behalf of others. (PSR ¶ 11). The defendant, Hauter, and Hamza facilitated hundreds of illicit money transfers, with each transfer ranging from thousands to hundreds of thousands of dollars. (PSR ¶ 11). For the illicit transactions they completed, the defendant and his co-defendants typically earned a commission of between one and six percent of the total amount transferred. (PSR ¶ 11). The one- to six-percent commission often reflected a total commission that was otherwise split among the defendants or those working with them to complete the illegal money transfers. (PSR ¶ 11). Typically, the defendant received a portion of that total commission ranging between 1% and 2% of the total money transferred, although sometimes his commission could be greater. (PSR ¶ 11). To facilitate these illicit transfers, the defendant and his co-defendants worked with other members of an international network of money brokers to transfer money through an informal money transmitting system known as "hawala." (PSR ¶ 11).

*Hawala* is a method of moving money outside the formal banking system that allows one party to transfer money to another party without any physical money actually moving. (PSR ¶ 12). The money transfers that *hawala* brokers—like the defendant, Hauter, and Hamza—complete for their customers are cheaper, swifter, and more anonymous than the formal banking system. (PSR ¶ 13). Unlike a traditional bank transfer such as a wire transfer, there are no official records of *hawala* transfers, and it is difficult to trace the original source of the money. (PSR ¶ 13). Because of those attributes, *hawala* networks are often used by money launderers and other criminals to transfer criminal proceeds. (PSR ¶ 13). Typically, money brokers engaged in *hawala* communicate only limited information about the source and the beneficiary of the funds they move. (PSR ¶ 13). For example, they often collect funds from their customers in cash or money orders and then move the funds through shell companies to disguise the source and nature of the funds involved in the transaction. (PSR ¶ 13). The defendant, Hauter, and Hamza used similar methods in this case.

More specifically, the defendant, with the assistance of his father, ran his own unlicensed money transfer business out of his home in New Jersey. (*See* PSR ¶¶ 14, 21). In furtherance of that scheme, the defendant purported to operate at least four companies based in Texas and then New Jersey: Itaqwen, LLC, Mirage Energies Inc., Mirage Auto Group Inc., and Mirage Life Style Inc. (PSR ¶ 14). The defendant told banks and other financial institutions at which he opened accounts for Mirage Energies Inc., Mirage Auto Group Inc., and Mirage Life Style Inc. (together, the "Mirage Companies") that he used the Mirage Companies to operate an international trading and investment business or to sell cars.[1] (PSR ¶ 14). That was a lie. (PSR ¶ 14). In truth, he used the Mirage Companies and Itaqwen, LLC to engage in unlicensed money transfers for profit. (PSR ¶ 14).

The defendant also lied to the financial services company TransferWise (now, Wise) about the nature of his business. For example, on recorded calls with TransferWise, the defendant represented that he used his Mirage Companies to run an international commodities trading business. More specifically, he represented that (i) he runs a trading company that buys and sells different "commodities" like cars, cellphones, and equipment, (ii) he buys products all over the world and has customers everywhere, (iii) customers pay him and he buys the products for the customers, and (iv) he has a number of employees working for him, including a "legal team," a "financial team," and a "regulations teams." All those statements also were lies.

In carrying out the scheme, individuals or companies contacted the defendant directly (or through other money brokers like co-defendant Shaker Hauter) to get the defendant to transfer money to others on their behalf. (PSR ¶ 19). Typically, the defendant helped transmit funds between the United States and countries in the Middle East like Yemen, Turkey, Iraq, and Jordan. (PSR ¶ 19). To carry out the money transfers, the defendant received money into bank accounts he opened in the name of the Mirage Companies (the "Mirage Company Bank Accounts") in the form of cash or money order deposits that were structured to avoid reporting requirements. (PSR ¶ 19). Then, he used the money in his accounts to send wire transfers or make credit card payments

---

[1] In 2022, the website for Mirage Life Styles purported to sell discounted gift cards for businesses like Walmart and Target; it had nothing at all to do with selling cars or operating an international trading and investment business.

to the intended recipients or other intermediaries, thereby circumventing federal law. (PSR ¶ 19). Every time the defendant conducted such a transaction, he received a commission, often one or two percent of the total amount of the transfer. (PSR ¶ 19). There was otherwise no legitimate business activity taking place in the defendant's bank accounts.

Based on a review of a digital ledger used by the defendant to manage his illegal money transfer business, which tracked transactions between in or about the beginning of 2020 through the middle of 2022 (which is not the whole period he was involved in this scheme), the defendant executed approximately $38.5 million worth of illegal transactions. (PSR ¶ 27). The amount of money detailed in the defendant's ledger is also consistent with the tens of millions of dollars— acquired by the defendant primarily through cash and money order deposits— that flowed through the defendant's own bank accounts during the scheme. (*See* PSR ¶¶ 16-17). Using a conservative estimate of the defendant's commissions earned on those transactions—that is, assuming a one-percent commission on just the transactions from the digital ledger—the defendant would have earned approximately $385,000 through his illegal money transfer business. During the same time, however, the defendant also withdrew approximately $626,000 in cash from his own bank accounts.

    2. *The Means and Methods of the Defendant's Scheme*

During this investigation, the Government obtained warrants to search the defendant's iCloud (the "iCloud"), the defendant's Google account (the "Google Account"), and Hauter's cellphone (the "Cellphone"). Those sources contained extensive evidence of the defendant's guilt, including many examples of communications establishing the means and methods of the defendant's unlicensed money transmitting business and the network of money brokers with whom he worked. The communications included text messages, WhatsApp messages, and voice notes exchanged between (i) the defendant and Hauter, (ii) the defendant and his father, and (iii) the defendant and his clients or other money brokers, among others.[2]

For example, in June 2020, the defendant created a WhatsApp group chat that included Hauter, one of Hauter's sons, a money broker known as "Abu Abdullah," and two other money brokers. (PSR ¶ 24). We have substantive communications from that group chat between March 2022 and May 2022.[3] (PSR ¶ 24). In the group chat, the participants discussed specific money transfers and confirmed that the defendant and his father (Hamza) regularly received money drops from Hauter and his sons in connection with those money transfers. (PSR ¶ 24). For example, on March 25, 2022, the money broker known as Abu Abdullah wrote "$221,000 . . . The recipient is Abdul Wahed Saleh Yahya Al-Amiri Sender Saleh Al-Ward Abdullah Istanbul, Türkiye." (PSR ¶

---

[2] Often, the content of the iCloud and the Cellphone was in Arabic. During the Government's review of the iCloud and the Cellphone, the Government used machine translations, including Google translate, to translate the content of the iCloud and the Cellphone from Arabic to English.

[3] The group chat was extracted from the Cellphone. From what the Government obtained in the extraction, the Government can see that the defendant created the group chat in June 2020, but the Government does not have messages between June 2020 and March 2022.

24). The defendant responded by writing, "It was completed." (PSR ¶ 24). The next day, Hauter's son wrote, "It was delivered to the hands of Abu Muhannad Al-Zubaidi 230,230." (PSR ¶ 24). "Abu Muhannad Al-Zubaidi" translates to "the father of Al-Zubaidi," i.e., Hamza. (PSR ¶ 24). The defendant responded by writing, "Thank you." (PSR ¶ 24).

In addition, on or about March 13, 2022, the defendant exchanged messages with Hauter over WhatsApp regarding a money transaction that went awry. (PSR ¶ 25). More specifically, the defendant was told by Hauter that someone was stuck in Chicago with $600,000 and that police took that person to a bank, counted the money, gave him a piece of paper, and did not imprison him. The defendant asked for the paper that the police gave that person in Chicago and Hauter sent the defendant a receipt for the seizure. Hauter then wrote the defendant, "the owner of the company called me to help him, and he is ready to pay any percentage." The Government understands "percentage" to mean a commission. The defendant and Hauter exchanged more messages about this transaction and the defendant asked Hauter how much the defendant had available, which the Government understands to be a reference to how much money the defendant could contribute to that transaction. Ultimately, Hauter directed the defendant to contact another money broker located outside of the United States to finalize the transaction. (PSR ¶ 25).

Other records found in the iCloud, Google Account, and Cellphone—including images, videos, and search history—provide further insight into the means and methods of the defendant's illegal money transfer business. (*See* PSR ¶ 26). For example:

- There was at least one video of someone counting bulk cash saved in the iCloud and many images of bulk cash and bank receipts saved in the Cellphone, including images of bank receipts for cash deposits that correspond to transactions between the defendant and Hauter. (*See* PSR ¶ 26(b)). Some examples are below:



*Still image from video of bulk cash saved in Al-Zubaidi's iCloud*

*Images of bank receipts that correspond to transactions with Al-Zubaidi*

- There also were images of money transfer receipts or confirmations saved in the defendant's iCloud. Often, these images included an ID of the sender or recipient, an amount of money that was transferred, or a serial number or token. Some examples are included below.

 

*Money Transfer Receipt from June 8, 2021*     *Other Money Transfer Receipt from iCloud*



*Other Money Transfer Receipt from iCloud*

- There were also many images of invoices saved in the iCloud that are consistent with the invoices mentioned in conversations between the defendant and money transfer "clients."

- There were also many notes saved in the iCloud detailing money transfers. Below are some examples of those notes.

```
Name : KAWTHAR Y ALANY
Bank : Washington Trust Bank
Address : PO Box 2127 Spokane WA
Routing : 125100089
Swift Code : WTBAUS66
Tell Receiver :   0015099530677
Account number : 1000957546
Amount : $23,960


911 E Indiana Ave
Unit 7
Spokane, WA  99207
United States
```

```
NAME: HAYFAA ABDULLAH
BANK : CHASE
SWIFT: CHASUS33
ROUTING NO: 044000037
ACCOUNT NO : 692121093
AMOUNT : $20,000
```

- Finally, there was also search history saved in the Google Account demonstrating the defendant's involvement with the defendant in this illicit financial scheme. (PSR ¶ 25(c)). For example, in or about February and March 2022, the defendant conducted Google searches for things like (i) "Shaker Hauter," (ii) "fbi is investigating a money laundery [sic] network in nyc," (iii) "united states vs mohanad alzubaidi," and (iv) "fbi is investigating arab money laundering network." (PSR ¶ 26(c)). Below are some examples of those searches.

```
united states vs mohanad alzubaidi - Google Search
Mar 25, 2022, 8:02:02 PM UTC

united states vs mirage energies inc - Google Search
Mar 25, 2022, 8:01:35 PM UTC

unite dstates vs mirage energies inc - Google Search
Mar 25, 2022, 8:01:22 PM UTC

mirage energies inc - Google Search
Mar 25, 2022, 8:01:14 PM UTC

fbi is investigating arab money laundering network - Google Search
Mar 25, 2022, 8:01:01 PM UTC

fbi is investigating arab money laundering network - Google Search
Mar 25, 2022, 8:00:47 PM UTC

FinCEN Files Show Criminals Moved Billions As Banks Watched
Mar 25, 2022, 7:59:52 PM UTC

fbi is investigating arab money laundering network - Google Search
Mar 25, 2022, 7:59:34 PM UTC

fbi is investigating arab money laundering network - Google Search
Mar 25, 2022, 7:59:31 PM UTC

fbi is investigating a money laundering network in houston texas - Google Search
Mar 25, 2022, 7:59:03 PM UTC

fbi is investigating a money laundering network in houston texas - Google Search
Mar 25, 2022, 7:58:46 PM UTC

Paraguayan ex-official sentenced in money laundering scheme
Mar 25, 2022, 7:58:20 PM UTC
```

During this investigation, the Government also conducted video and physical surveillance at a location in the Bronx that was known to be an area where the defendant and his two co-defendants conducted money transfers during which law enforcement officers observed Hamza meet with and pick up what were black bags full of cash from Hauter and at least one of his sons on occasions in May, June, and July 2022. (PSR ¶ 20). That money would then get delivered to the defendant or deposited by Hamza into a bank account controlled by the defendant.

### 3. The Defendant's Bank Accounts

Between 2018 and 2022, the defendant and Hamza used Itaqwen and the Mirage Companies to open over 20 bank accounts at over ten different banks.[4]

While opening and maintaining those bank accounts, as described above, the defendant and Hamza represented to the banks that they were running a legitimate business. The defendant also made specific representations to some of the banks about the nature of his business—e.g., that his business was "automobile and other motor vehicle merchant wholesalers," that he owns a car dealership in Texas, that he expanded his car dealership to New Jersey, and that the bulk cash in his accounts comes from customers coming in to purchase vehicles and paying him in cash. Those representations were lies.

The defendant's and his father's bank account activity for the period of 2018 to 2022 makes clear that they were using the Itaqwen and Mirage Company bank accounts to engage in their criminal scheme. (PSR ¶ 15).

For example, between in or about 2018 and in or about 2022, the defendant and his father moved approximately $29.5 million through bank accounts opened in the name of Itaqwen LLC and the Mirage Companies. (PSR ¶ 16). Over that period, they received approximately $29.6 million in deposits into those accounts composed primarily of cash deposits, money orders, and wire payments. (PSR ¶ 16). More specifically, over that period, they received (i) approximately $13.7 million in money order deposits, (ii) approximately $10.9 million in cash deposits, and (iii) approximately $5 million in wire deposits. (PSR ¶ 16).

During the same period, the defendant and his father wired out of or withdrew from the accounts approximately $29.5 million. (PSR ¶ 17). More specifically, they wired out (i) approximately $5.1 million to TransferWise, which is an electronic money transfer platform often used to send money abroad, (ii) over a million dollars each to three other entities, and (iii) hundreds of thousands of dollars each to over thirty additional entities. (PSR ¶ 17). They also withdrew approximately $626,000 in cash, made hundreds of thousands of dollars in credit card payments, and moved hundreds of thousands of dollars between different Mirage Companies. (PSR ¶ 17).

---

[4] The defendant was the sole signatory on most of those bank accounts, except for at least three accounts where his father, Hamza, was listed as sole signatory. The defendant also opened at least one bank account in the United States in the name of his brother, who resides in Iraq, and used that bank account to conduct his unlawful financial activity.

The movement of money in the bank accounts controlled by the defendant and his father also followed a typical pattern. Every month or so, one or more of his accounts received a series of large money order or cash deposits ranging from hundreds of thousands of dollars to millions of dollars. Then, within a short period of time, often within just a few days, the balance in those accounts was rapidly depleted through wires and withdrawals. (*See* PSR ¶ 18).

### B. Guilty Plea and Guidelines Calculation

On or about January 15, 2025, the defendant pleaded guilty to Count One of the Indictment pursuant to a plea agreement. In the PSR, the Probation Department concurs with the parties' Guidelines calculations and recommends that the Court sentence the defendant principally to 30 months' imprisonment. The defendant requests a sentence of time served.

## II. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After making that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];

>   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>   (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

### B. The Court Should Impose a Sentence At the Bottom of the Guidelines Range

The 3553(a) factors weigh in favor of a sentence of 57 months' imprisonment, which is the bottom of the Guidelines range. Such a sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing.

*First*, a sentence of 57 months' imprisonment is necessary to reflect the seriousness of the defendant's conduct and to provide just punishment for his offense. The defendant participated in a vast and sophisticated illegal money transfer scheme over a four-year period. That scheme entailed the defendant and his co-conspirators illegally transferring more than $65 million between the United States and other countries, in particular, other countries in the Middle East. The defendant, himself, was involved in illegally transferring at least $38.5 million of that more than $65 million and personally profited in the amount of at least $385,000, although he withdrew more than $626,000 in cash from the bank accounts he used to carry out the scheme. He also took significant steps to hide his conduct by lying to banks and other financial institution he relied on to execute his illegal money transfers.

Individuals use underground money transmitters like the defendant because they are cheaper, swifter, and more anonymous than the formal banking system. Unlike a traditional bank transfer such as a wire transfer, there are no official records of these illegal transfers, and it is difficult to trace the original source of the money. As the defendant did here, illegal money transmitters often collect funds from their customers in cash or money orders and then move the funds through shell companies to disguise the source and nature of the funds involved in the transaction. Because of those attributes, networks like the defendant's are often used by money launderers and other criminals to transfer criminal proceeds. *See, e.g.*, Dina Habjouqa and Joanna Clendinning, "Hawala: Ancient Money Transfer System Poses Modern Risk," Dow Jones, https://www.dowjones.com/professional/risk/resources/risk-blog/hawala-risks (Last Accessed: April 4, 2025) ("The system also can be exploited for money laundering by discretely introducing criminal funds into the financial system, manipulating them to appear legitimate and making them available for further use. At each stage of the process, Hawala erodes the dirty money trail."); FATF Report, "The Role of Hawala and Other Similar Service Providers in Money Laundering

and Terrorist Financing," The Financial Action Task Force, October 2013, https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Role-of-hawala-and-similar-in-ml-tf.pdf.coredownload.pdf (Last Accessed: April 4, 2025) (same). Accordingly, a significant sentence is required to account for the seriousness of this offense.

To minimize his own culpability, however, the defendant argues that there is no evidence that the transactions that he engaged in as part of this scheme involved criminal proceeds. (*See, e.g.*, Def. Submission at 14, 20). That is not entirely true. While there is no direct evidence establishing that the money involved in a specific transaction was criminal proceeds (which, of course, of not an element of this crime), there is circumstantial evidence that the defendant and his co-conspirators were engaged in money laundering. For example, in or about February and March 2022, the defendant conducted specific Google searches for things like (i) "Shaker Hauter," (ii) "fbi is investigating a money laundery [sic] network in nyc," and (iii) "fbi is investigating arab money laundering network." (PSR ¶ 25(c)). In addition, the defendant himself went to great lengths to disguise his own illegal activity: the defendant used four different shell companies to open over 20 bank accounts at over ten different banks and lied directly to several of those banks about the nature of his financial activity. All those acts are tell-tale signs of money laundering and evidence of the sophistication of the defendant's criminality.

But even if there was no evidence that some of the money at issue here came from other crimes, that would not be a surprise; in fact, that is one of the salient features of hawala networks. A central purpose of hawala networks is to obscure the nature and origin of the money transfers so as to make them appear legitimate when, in reality, they could be criminal in nature and, thereby, to frustrate law enforcement's ability to detect underlying criminal activity. The very existence of these networks creates a mechanism that criminals can use to circumvent the traditional banking system and the safeguards it has in place to detect or prevent exploitation by criminal organizations. Accordingly, the defendant's participation in this hawala network perpetuated a system that is routinely exploited by criminals and, therefore, his illegal money transfer business—whether it was in fact used by criminals or not—is extremely serious conduct warranting a substantial sentence.

*Second*, a 57-month sentence is also necessary to afford adequate deterrence and to protect the public. For all the same reasons described above—including that they are easily exploitable by other criminals and, by their very nature, perpetuate underground financial transactions that circumvent important financial regulations—illegal money transmitting schemes like the one at issue here present a significant risk to the public. They are also very difficult to detect and dismantle. Accordingly, the cost-benefit analysis for the defendant and others contemplating similar schemes may tip in favor of using similar methods to move millions of dollars across borders, absent a significant prison sentence in this case.

*Finally*, the defendant offers several mitigating arguments that, in his view, warrant a substantially below-Guidelines sentence of time served, which amounts to a sentence of approximately 15 months' imprisonment. None of those arguments, however, justify a sentence below the bottom of the Guidelines.

First, the defendant argues that he is a fundamentally good man who has already lost so much because of his conduct that he should be given leniency in the form of a time-served—that is, a 15-month—sentence. (*See* Def. Submission at 5-7, 9, 14-15). The Government acknowledges that the defendant has served his community (including as a member of the medical profession) and is sympathetic to the difficulties the defendant's wife and children have endured because of his crimes. The Government does not, however, agree that those facts justify a time-served sentence. As an initial matter, and as the Probation Office also recognized, (*see* PSR at p. 26), it is very difficult to make sense of the defendant's choice to forgo pursuing a career in medicine to become a highly sophisticated white-collar criminal. His offense conduct—including his use of multiple shell companies and nearly 20 different bank accounts, the ease with which he lied to banks and other financial institutions to facilitate and disguise his crimes, and his willingness to incorporate his own father in his criminal activity—reveals the exact opposite of the man described in the defendant's sentencing submission. Accordingly, while the defendant asserts that the man he is today is not the man responsible for the crimes at issue, (Def. Submission at 6), it is hard to credit that statement. Moreover, the harm the defendant's family is suffering is the direct result of his own selfish actions. He engaged in this crime out of greed and made victims out of his own family. The suffering he exposed his family to, while deeply tragic, cannot be a reason to reduce his sentence. Moreover, the defendant included his own father in his criminal scheme, which is an aggravating factor, not a mitigating one.

Second, the defendant argues that a prison sentence longer than 15 months is not necessary to deter the defendant and any other individual who is considering committing this crime, (*see* Def. Submission 9-11). He is incorrect. As to specific deterrence, given the defendant's willingness to engage in this crime in the first place, notwithstanding his family responsibilities and medical aspirations, it is by no means reasonably certain that a 15-month sentence is significant enough to serve as a sufficient deterrent. But even if you credit the idea that the defendant himself is at a low risk of recidivism, the need for general deterrence demands a sentence well-above the defendant's request. Simply put, a 15-month sentence is far too cheap a price to deter someone from committing a crime that is as hard to detect (or as lucrative) as running an underground financial network. A significant sentence is necessary to tip the cost-benefit analysis of any similarly situated would be schemer.

Third, the defendant's argument that he should receive a significantly-below-Guidelines sentence because he spent 15 months in the Metropolitan Detention Centner ("MDC") (*see* Def. Submission at 15-16), also fails to justify his recommended sentence. There is no dispute that the MDC has faced difficult challenges and that inmates, including the defendant, have experienced consequences because those challenges.  That said, the defendant was not incarcerated at the MDC in 2020 or early 2021, at the height of the COVID-19 pandemic where there were more difficult conditions.  And even when defendants were incarcerated at the height of the pandemic, a number of courts found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart*, No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g.*, *United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a

defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).

Furthermore, the conditions at MDC have improved significantly over time. Indeed, at a bail hearing in January of this year, Judge Caproni—who, like this Court, is deeply engaged in the issues at MDC, including attending regular meetings about MDC with the Bureau of Prisons, the Federal Defenders, and the US Attorney's Offices for the Southern and Eastern Districts of New York—stated the following about arguments like that of the defendant:

> Let me just say, to all of the: MDC is a horrible place, and it's awful, and they're going to be locked down forever, that's just not true anymore. All of those decisions that you read about were months ago. There's a lot more staffing at the MDC. The number of defendants who are ending up in lock down for substantial periods of time are minimal. . . . MDC -- look, it's a jail. But the horror stories from a year ago are just – it's not the facility. They have put a lot more staff on. They've got a lot more medical staff, and they're doing the best they can.

(Transcript from January 16, 2025 appearance in *United States v. Alon Alexander et al.*, 24 Cr. 676 (VEC) at 125). In light of the way in which the conditions at MDC are improving, and given all the vital 3553(a) factors described above, the Court should decline the defendant's invitation to significantly reduce his sentence.

Fourth, with respect to the allegedly comparable cases cited by the defendant as a reason for the Court to impose a significantly below-Guidelines sentence, (Def. Submission at 17-20), it is notable that there is no discussion of what, if any, mitigating factors were present in those cases that would justify a similarly low sentence here. That said, the one case cited by the defendant that was before this Court—*US v. Mauricio Mazza-Alaluf*, 07 Cr. 403 (PKC)—is a viable comparator to the defendant's case. From what the Government can glean from the docket in that matter, Mr. Mazza-Alaluf illegally transmitted over $200 million in funds, proceeded to a bench trial to pursue a legal challenge to the statute of conviction and not necessarily a challenge to the facts at issue, and was convicted. At sentencing, Mr. Mazza-Alaluf pursued a 24-month sentence and made mitigating arguments similar to those at issue here, including that Mr. Mazza-Alaluf (i) was 56-years old, (ii) had a family that faced severe hardship without him present, (iii) was a supportive and affectionate father and a devoted husband, (iv) had no prior exposure to the criminal justice system, and (v) was unlikely to recidivate. (07 Cr. 403, Dkt. 74 at 12). Mr. Mazza-Alaluf, like the defendant here, also argued that a 24-month sentence would provide adequate general deterrence. (*Id.*). Notwithstanding all those factors, this Court sentenced Mr. Mazza-Alaluf to 42 months' imprisonment, which is on par with the Government's recommendation here and far greater than the 15 months requested by the defendant.

In sum, a sentence at the bottom of the Guidelines would account for the seriousness of the defendant's crime, provide just punishment, afford adequate deterrence, and help protect the public from further crimes of the defendant while, by contrast, a sentence of time-served would undermine the purposes of sentencing.

## III. Conclusion

      For the reasons set forth above, the Government respectfully requests that the Court impose a sentence at the bottom of the applicable Guidelines range of 57 to 60 months' imprisonment.

                                  Respectfully submitted,

                                  MATTHEW PODOLSKY
                                Acting United States Attorney for the
                                Southern District of New York

                      by: _____
                              Matthew J. King
                              Amanda Weingarten
                              Assistant United States Attorneys
                              (212) 637-2384

Cc:    Peter Katz, Esq. (By ECF)